UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHASTITY WATKINS, Individually and as Guardian of the Person and Estate of A.G., a minor,<br><br>      Plaintiff,<br><br>   v.<br><br>UNITED STATES OF AMERICA, VHS WEST SUBURBAN MEDICAL CENTER, INC., MARY LEUNG, R.N., and KARRI MACMILLAN, D.O.,<br><br>      Defendants. | No. 18 C 4142<br><br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Chastity Watkins brings this medical malpractice action against the United States, by and through its agents and employees Dr. Natasha Diaz and Dr. Tyler Callahan (the "Government"), VHS West Suburban Medical Center, Nurse Mary Leung, and Dr. Karri MacMillan. The Government moved for summary judgment. R. 140. For the following reasons, that motion is denied.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To

defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

On November 4, 2015 at 1:34 a.m., Plaintiff Chastity Watkins, 36 weeks pregnant, was admitted to the labor and delivery floor of West Suburban Hospital. R. 161 ¶ 9. Nurse Bruno-Camuy, the overnight nurse charged with Watkins's care, placed an external monitor on Watkins to record contractions and fetal heart rate. *Id.* ¶ 10. The last fetal heart rate recorded on the monitor occurred at approximately 6:50 a.m. *Id.* ¶ 11. Nurse Leung began her shift at 7:00 a.m. and took over Watkins's care from Bruno-Camuy. *Id.* ¶ 12; *see* R. 148 at 20-21 (Leung Dep. 24:22-26:2).

Doctors Diaz, Callahan, and MacMillan also began their shifts at 7:00 a.m. R. 161 ¶ 16. At the time, Diaz was the attending physician on the labor and delivery floor, Callahan was a family practice physician completing a fellowship for caesarean section privileges and the on-call fellow, and MacMillan was a family practice physician completing her second year of West Suburban's residency program. *Id.* ¶¶ 6-8, 19, 32. Both Diaz and Callahan were employed by the federally funded clinic "PCC." *Id.* ¶¶ 7-8.

2

Standard practice for West Suburban's labor and delivery floor doctors was to begin their shifts by receiving "sign-out" from the physicians on the prior shift, which entailed discussing the important details about each patient's case. *Id.* ¶¶ 17-18. After receiving sign-out on the morning in question, Diaz and MacMillan began "rounding" together, which involved meeting and evaluating each patient and deciding on a daily treatment plan. *Id.* ¶¶ 20-21. The parties dispute whether Callahan was also rounding with Diaz and MacMillan that morning. *See id.* ¶ 20.

At West Suburban Hospital, residents carry "duty phones," and nurses are directed to contact the resident or a charge nurse if medical issues arise with patients they are monitoring. *Id.* ¶ 24. According to Watkins's medical records, at 7:28 a.m., Nurse Leung called MacMillan to report that she could not locate a fetal heart rate for the baby and to request an internal monitor. R. 148 at 206. MacMillan testified that they did not go to Watkins's room because they were rounding. R. 167 ¶ 3. MacMillan does not recall whether she told Diaz or Callahan about the contents of Leung's 7:28 a.m. call. R. 161 ¶ 27.

At 7:51 a.m., Leung called Diaz about Watkins, and Diaz responded that she was still rounding but would be there shortly. *Id.* ¶¶ 29-30. Around 8:00 a.m., the nursing staff found A.G. underneath Watkins's thigh not breathing. *Id.* ¶ 38. An emergency call went out overhead directing medical personnel to immediately go to Watkins's room. *Id.* ¶ 39. Diaz and Callahan immediately went to the room and began performing emergency medical procedures. *Id.* ¶¶ 40-43. Watkins's baby was transported to Lurie's Children Hospital for immediate care and treatment and was

3

later diagnosed with severe hypoxic-ischemic encephalopathy (brain damage due to lack of oxygen). *Id.* ¶ 44.

Watkins's negligence allegations concern Defendants' conduct prior to A.G. being found at 8:00 a.m. *Id.* ¶ 45. The Government moved for summary judgment on Watkins's malpractice claim against Diaz and Callahan.

## Analysis

To prevail on a medical malpractice claim, a plaintiff must establish the following elements: "(1) the proper standard of care, (2) a deviation from that standard, and (3) an injury proximately caused by that deviation." *Prairie v. Univ. of Chicago Hosps.*, 698 N.E.2d 611, 614-15 (Ill. App. Ct. 1998) (citing *Purtill v. Hess*, 489 N.E.2d 867, 872 (Ill. 1986)).

Watkins's expert Dr. Andrew Hull testified that the loss of a fetal heart rate or intermittent tracing for a patient being continuously monitored constitutes a medical emergency, and had MacMillan informed Diaz about the substance of her 7:28 a.m. call with Nurse Leung, the standard of care required the doctors to go immediately to Watkins's room. R. 167 ¶¶ 13, 15. The parties do not dispute that MacMillan never informed Diaz or Callahan about the content of her call with Leung. However, Hull further opines that Diaz and Callahan had an affirmative duty to ask MacMillan about the call and/or why she stepped away to answer it, and that they breached the standard of care by failing to do so. *Id.* ¶¶ 20-21, 24. Hull continues that if Diaz and/or Callahan had satisfied this duty, they could have immediately attended to Watkins rather than waiting until 8:00 a.m. *Id.* ¶ 21.

For purposes of summary judgment, the Government does not dispute Plaintiff's contention that Diaz and Callahan had a duty to ask MacMillan about the substance of the call. However, the Government contends that to inquire about the call, the physicians first had to *know* about the call, and that Watkins has not adduced any evidence to show that Diaz and Callahan knew a call occurred. In short, the Government argues that Watkins failed to provide evidence that Diaz and Callahan were present when Leung called MacMillan.

To support its position, the Government points out that Diaz testified she could not recall whether she was present when MacMillan received the call. *See* R. 148 at 125 (Diaz Dep. 53:14-18). As to Callahan, the Government argues it was impossible for him to be present because he was in a different area of the hospital. R. 141 at 8. Specifically, Callahan submitted an affidavit stating that the sign-out process took longer than normal on the morning in question, that he was in the post-partum wing on the opposite side of the floor from where laboring patients' rooms are located when he heard the emergency call, and that Watkins was the first patient he saw that morning when he responded at 8:00 a.m. *See* R. 148 at 234 (Callahan Dec. ¶¶ 4, 6).

Watkins makes several arguments as to why it is a factual dispute whether Diaz and Callahan were present, including by pointing out that it was standard practice for Diaz, Callahan, and MacMillan to do rounds together, by challenging Callahan's memory, and by arguing that Callahan's affidavit contradicts his deposition testimony and is self-serving. But the Court need not address those

5

arguments because what is dispositive here is that MacMillan testified that she was with Diaz and Callahan when she received the call from Leung:

> Q. When you got this call from Nurse Leung, what exactly were you doing?
> A: I was in the midst of rounding and discussing the – one of the two patients that we thought would be imminently delivering.
> Q: And when Mary [Leung] called, you were with Dr. Diaz and Dr. Callahan; is that correct?
> A: Yes.

*Id.* at 64 (MacMillan Dep. 49:24-50:6). The Government argues that MacMillan also testified that she had no recollection of the call, and thus could not know whether Diaz and Callahan were there when she received it. But to the extent MacMillan's testimony is inconsistent, it is inappropriate to resolve the inconsistencies at summary judgment. *See Holden Metal v. Wismarq*, 2004 WL 1498152, at *2 (N.D. Ill. July 1, 2004) ("[Defendant] may very well be correct that [the witness] has been inconsistent or that certain inferences should be drawn based on his testimony, but these are arguments for the jury, not for summary judgment."). The Government also argues that being "present" does not necessarily mean that Diaz and Callahan were aware the call occurred. *See* R. 168 at 10-11. But in so arguing, the Government asks the Court to draw facts and reasonable inferences in its favor, which is impermissible at this stage.

In short, it appears from the record that MacMillan, Diaz, and Callahan all have clouded memories about what occurred on the morning of November 4, 2015 in their care of Chasity Watkins. And there is conflicting evidence about Diaz's and Callahan's whereabouts when MacMillan received the call from Leung. As the

6

factfinder in Watkins's case against the Government, the Court will ultimately have to make these determinations based on the evidence at trial. But given the conflicting testimony, doing so at this stage would run afoul of the well-settled standard applied to motions for summary judgment.[1]

## Conclusion

For the reasons stated, the Court denies the Government's motion for summary judgment. R. 140.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: June 25, 2020

---

[1] The Government raises two other arguments which the Court briefly addresses. First, the Government argues that Diaz and Callahan cannot be vicariously liable for a resident's errors under Illinois law. Watkins clarifies in her response to the Government's motion that the claims against Diaz and Callahan are not based on vicarious liability and thus the argument is moot. Second, the Government argues that Watkins cannot establish a liability case against Diaz based on her response to the 7:51 a.m. call because Watkins never disclosed such a theory as required by Federal Rule of Civil Procedure 26(a)(2). It is unclear whether Watkins seeks to pursue this theory of liability and the issue appears more appropriately decided on a motion in limine. The Government may raise the issue in its motions in limine and the Court will decide the matter at that time.